420-0091 WC consolidated with 419-0095 WC. Ryan Kmieciak, Appellant v. The Workers' Compensation Commission, Reynolds Consumer Products, Appalachia. Mr. Haxel, you may proceed. Thank you, your honor. May it please the court and Mr. Brewer, opposing counsel. I'm the attorney for Ryan Kmieciak, the injured worker in this matter. And the first issue I would like to address in my arguments this afternoon have to do with the commission's erroneous decision to reverse the arbitrator's award of TTD benefits. The commission reached the conclusion that the petitioner had resigned his employment with the respondent, which is not only contrary to law, but also contrary to the evidence presented at trial. As the court knows, on issues involving legal matters, the standard of review is de novo and not manifest weight. And opposing counsel concedes in his brief that the commission got it wrong in that they imposed a burden upon the petitioner to prove he had not resigned when, in fact, that burden of proof rested upon the respondent. And the majority opinion of the reasons for taking away the TTD award was petitioner did not prove he had not resigned, which, of course, he had no duty to do. Counsel, who's Dr. Williams? Dr. Williams is the IME physician that petitioner was sent to at the behest of the respondent in August of 2014. All right. To the point you just raised, didn't Dr. Williams' issue report where he states that Klayman told him he had given a two-week notice in February of 2014, didn't Williams say that Klayman told him that? That statement is found in Dr. Williams' report. It is there. Right after that statement is the next statement, which says petitioner got a call on March 19, 2014, telling him he no longer had a job with the respondent, which is entirely consistent with the petitioner's testimony at trial. And I would also like to point out, that if, in fact, petitioner had given his two-week notice in February, clearly evidencing an intent to quit, that two weeks would have expired before he ever got the telephone call, before he ever went to get his MRI, or before he ever heard about the MRI, or excuse me, he did get his MRI on March 18. So that clearly would have been two weeks after he had allegedly given his two-week notice. So the fact that he was still there working, clearly evidence that he had not given his two-week notice back in February. I think that Dr. Williams got that either from the respondent or he took something out of context at the time of the Section 12 examination. I also would like to point out that the erroneous legal standard imposed upon the petitioner on this issue warrants a reversal all by itself. I cited the case of Freeman Coal Company versus the Industrial Commission in support of this argument. In Freeman Coal Company, the commission issued an erroneous decision saying petitioner had not met his burden of proof, but in that particular case involving coal workers pneumoconiosis, the statute gave a presumption in favor of the petitioner and it was therefore the respondent's burden of proof. Of course, the commission got that wrong and the court reversed it. The same thing should happen in this particular instance. The second reason given by the commission in support of its erroneous finding that petitioner had resigned is the testimony of Mr. Honan, who is the only witness I believe who testified on behalf of the respondent. And Mr. Honan merely stated that the respondent had a light duty program available and chances are had petitioner remained employed, he would have had light duty. Well, the problem with that is, one, Honan admitted he had never talked to petitioner about his employment status. He had never seen any documents about petitioner's alleged termination and he doesn't know who talked to petitioner in March of 2014 and who told the petitioner you no longer have a job here. So in essence, Honan just showed up to say we had light duty available and he didn't know anything else. All of his, the rest of his testimony is worthless because he didn't know. And the last factor relied upon by the commission in support of its TTD decision was the point you just raised, your honor, and that is there's a statement in the IME report saying petitioner gave his two-week notice in February. I would like to point out that what commission failed to mention is that when petitioner first saw the treating surgeon, Dr. Mark Greeding, approximately one month later, he specifically told the doctor, and it's mentioned in that office visit note, that he had been released from his job. And this was in April of 2014. Again, approximately a month after petitioner got the phone call saying don't come back to work. And petitioner admitted during trial that he had made some comments to people. They were, he and his wife were thinking about quitting and going back to Pennsylvania. But the fact is they never went back to Pennsylvania until the fall of 2016, two and a half years later. And as I pointed out in my brief, for someone to give their notice under the circumstances under which the commission claims petitioner quit his job is really absurd. He was still having a lot of problems with his hand. He ultimately underwent surgery. If he's having financial difficulties, why the heck would he quit and stick around for two and a half years, try to find a job wearing a splint when he still needs medical treatment? It makes no sense whatsoever to believe petitioner really quit his job. And the other thing is, respondent produced no documents supporting a resignation. They did not produce the person, some unit manager named Scott, who allegedly is a person who called petitioner and said you no longer have a job. He wasn't called to testify. The only evidence the respondent had to support their contention that he had quit is this testimony from Mr. Honan, which, as I pointed out, he really didn't know anything. So when you contrast that with what the petitioner did and what the petitioner testified to, he didn't go back to Pennsylvania for another two and a half years. He claims he never gave his notice. He never signed a document. He never submitted a letter. And the bottom line is the commission's decision on this issue is contrary to law, contrary to the evidence, and needs to be reversed. The second issue I would like to bring up is the commission's decision to vacate a man as a whole's award and give the petitioner 30% of a hand. I would just like to point out a few things. One, Commissioner Tyrell's dissent really got it correct. The court should follow his recitation of the facts and his logic. The arbitrator put together a very detailed 20-page decision. She's the one who awarded the 30% person as a whole award. No IME doctor, nobody from the respondent ever questioned the results of the functional capacity evaluation or the treating surgeon's reliance thereon. And the functional capacity evaluation, while it did show some tests where the petitioner had not given a consistent effort, there were other tests where he had given a consistent effort. So with regard to the PPD issue, I will rest upon what is in my brief. And in the absence of any questions, I will conclude my arguments at this point and wait for a rebuttal. I don't hear any arguments or questions. Is there any questions? No questions. And you'll have time and reply. Okay. Very good. Mr. Brewer, you may respond. Yes, Your Honor. May it please the panel, counsel, my name is Matt Brewer. I represent the FLE in beginning with the issue of the TTD, which is where counsel starts. That's where I will start. No need, I think, really to belabor the actual case law, interstate scaffolding, controlling the issue of the TTD. The real issue is here we're dealing with whether or not he refused to work within his restrictions, whether or not there was a resignation and whether or not as a result of the resignation, he refused to work within his restrictions. As counsel pointed it out, the petitioner admitted in his testimony that he did in fact tell co-employees, perhaps even a supervisor, that he was intending on leaving the state at some point and was considering separating his employment with the respondent. Well, that wouldn't be equivalent to actually resigning, would it? According to his testimony, he did not resign. And I don't think hypothetically saying that potentially you're going to leave would be considered a resignation, no. But whomever get back to Scott Honan, Scott Honan was under the impression that he had resigned. That was what his testimony was. And his testimony was that it was our understanding that Mr. Kamisiak had in fact resigned and had put in his two weeks because he was moving out of state. Now, counsel does bring up the issue with why would he quit if he was having financial troubles? Well, my response to that is when he was contacted on March 18th, 2014, and said we're accepting your resignation, we're moving up your two weeks, he didn't voice any objection to that. If he was truly having all of these issues financially, which I don't doubt that he was, why wouldn't he said, wait, wait, wait, wait, wait, I'm not resigning. I need this job. I'm still actively under medical care. Now, granted, he was working full duty at the time. But if he truly had not resigned and was having financial troubles, then why wouldn't he have said something to the person who called him and said, no, no, no, I did not resign and I want to keep my job. And there's no evidence that he did that. Bill, I'm sorry. He's asking a question. I have a question on that. Mr. Honan, who said that he was his understanding that the claimant had resigned. What was that understanding based on? As best I can tell from the record, then it's obviously that's all we have here today. It was based upon a conversation that he had with a supervisor, with Mr. Kamisiak's supervisor. But not with the claim. To my knowledge, that's correct. Not with the claim itself. So as best as best I can tell from the record that we have in front of us, Mr. Kamisiak had a conversation with his supervisor and that got reported to the unit manager, which was Scott Honan, who then obviously we have what we have now. We had what they consider to be a resignation and they accepted it. Did the supervisor testify? Supervisor did not testify, Your Honor. Mr. Brewer, what can you tell us about Dr. Gordon clearing the claimant to work and the timing of that? And did the claimant go back to work? What time period are you talking about, Your Honor? Shoot, I just had it. April of 14. He was cleared to go back at that time. He was. And at the time of the resignation, during March and April of 2014, he was working full duty until the point thereafter when he begins to see Dr. Green. So Dr. Gordon did have him at full duty and the MRI was taken shortly thereafter. Going back to the issue of the TTD, the way I look at the issue as far as how the commission handled whether or not he's entitled to TTD and ultimately the modification of the accident comes down to an issue of the commission simply judging the credibility of the witnesses, drawing what they believed was reasonable inferences from the testimony, the evidence, as well as given specifically the weight to each piece of evidence. They didn't believe the petitioner. The credibility of the petitioner goes into a little bit more of the PPD argument that I'll address here in a moment. But in addition to that, they explicitly stated in their opinion that they did believe Scott Honig. They found him to be credible. They found his testimony to be credible specifically regarding the resignation. And then obviously he did also testify regarding the fact that, and this is something that I don't think can go unstated here today, the accommodations that the respondent had given to the petitioner. They had a light duty program, an extensive light duty program. Not only that, as a result from the first accident, at times when the petitioner had no restrictions whatsoever, but was still having subjective complaints of pain, the respondent still accommodated him and worked with him despite the fact that he was not under any medical restrictions whatsoever from his treating physicians at the time, which would have been Dr. Alan at Mohawk back in 2013. Counsel, or excuse me, your honor, it also brought up the issue of the history that he provided to Dr. Williams. Take that for what it's worth. Dr. Williams takes a verbal history when he performs an independent medical examination. The portion where that reference is in his report is in the verbal history section, which he got directly from Mr. Kamesiak and whether or not the timing ends up working out to when they called him on March 18th. This is, this is information coming from Mr. Kamesiak and there's inconsistencies throughout the record. Perhaps he got it wrong on the day that he told, uh, or he informed Dr. Williams that he had resigned, but that's what the record says, what it says. Um, moving to the issue of the PPD, this, this is, this is strictly a credibility issue in my mind. I know there's going to be, uh, an issue or at least there's going to be red flags raised as to not having a subsequent IME. There's no medical professional that professional that quote unquote invalidated the restrictions, um, and whether or not the respondent. And my response is this is simply how the commission weighed the evidence. They gave little weight to the FCE or at least the results, the permanent restrictions for the FCE, Dr. Green's permanent restrictions, and they gave much more credibility and weight to inconsistent pain complaints, the lack of effort shown in the FCE, his failure to document a job search. Um, additionally, as I discussed a moment ago, the respondents accommodations, even when, you know, Mr. Kamesiak was at full duty. Um, and then obviously if this panel believes that he did in fact voluntarily resign, then the respondent didn't have an opportunity to accommodate the the permanent restrictions that were ultimately issued by, um, by Dr. Green. And therefore we, we, we agree with the commission's defined commission's decision that this was not a loss of trade and was instead, um, a loss of use of the hand. Um, if I can, just for a moment, I would like to touch base a little bit on the first accident. Um, and I know this isn't as pressing of an issue as the others, um, but as far as, um, only having one permanency award and not having two separate awards as Arbitrator Lindsey had issued. Um, the important thing I think to point out here is when he's released at MMI from the first accident, and this is at the end of July, 2013, he does still testify. He testifies that he did have still have pain and his record from that date shows that he still was complaining of symptoms and those symptoms never went away per his testimony. Now, if we are to believe that his pain complaints did not go away, then I don't think it's unreasonable for the commission, which they have in this case to state that we are unable to separate what permanency would have been attributable to the first accident versus the second accident. Um, obviously the commission cited the Baumgardner case. Uh, there's in that case to the city of Chicago case dealing with somewhat different fact patterns, but here, I think it's pretty clear that it's, it's, it's almost impossible to delineate. Even if the, if the panel does believe that you would be able to separate the first accident from the second, as far as a PPD award, I'm still not convinced that he actually proved entitlement to PPD for the first accident. He didn't have any lost time. He worked full duty throughout, including after MMI, didn't have any loss of burning capacity. His MRI didn't show much of anything. And, you know, despite his subjective complaints, he didn't seek any care between the end of July of 13 until the time of his second, more severe accident in March of 14. Um, and for those reasons, we agree with the vacating of the 5% of a hand that was issued by the commission and subsequent to any additional questions. We believe that the decision of the commission should be affirmed in its entirety. Okay. I don't believe there are any questions. Mr. Brewer, Mr. Axel, you may reply. Thank you, your honor. Uh, when Mr. Brewer states that petitioner didn't raise any objection when he was told he no longer had a job, my question is where in the record is that? We are all confined to the evidence presented at trial, which is in the record on appeal. And the only testimony about that comes from the petitioner himself, who says he received a phone call from a unit manager named Scott on the morning of March 19, 2014, telling him you no longer have a job. Come here and get your things and be gone. And nowhere does it say he didn't object. Nowhere in the record are you going to find where he didn't become upset over the fact that he had lost his job. So that's the first point I'd like to make. Uh, second point is it's not that petitioner refused to work. There's undisputed testimony that the respondent accommodated his restrictions when he was employed and most likely would have accommodated his restrictions had he remained employed. But they fired him. So that's really a moot point. And the evidence at trial, the undisputed evidence shows he was entitled to TTD for over a year. And so the last thing is, once again, the commission employing an erroneous legal standard. It was not petitioners duty to prove he didn't resign. It was a respondent's duty to prove that he had, and they have failed to do so. And as a matter of law, that finding needs to be reversed now with regards to permanent person's ability. I'm sorry, Mr Haxel. Before you move on, honey testified. Essentially, the purpose of his testimony was that there is light duty program. This statement that he understood that the claimant resigned. What, if any way, can we give that statement? I think it's clearly number one. I don't think you can give it very much weight at all. I don't hardly any. If any one, it's clearly comes from a person who does not have personal knowledge of the situation. He understands petitioner resigned. Well, that means somebody told him that he admitted in cross examination. He didn't ever talk to petitioner. He didn't talk to the person who was in charge of the petitioner's alleged resignation. He really did not know. So so if we give it really no weight as to that issue, we've just got the statement of the petitioner. Well, you've got the state. You've got the testimony of the petitioner, coupled with the fact that he didn't move back to Pennsylvania for 2.5 years. Coupled with the fact that a few months later, both the I. M. E. Physician and the treating doctor both said he needs more treatment. He's not at M. M. I. Um, Your Honor, you had asked Council a question about Dr Gordon during Mr Brewer's argument. I would like to point out that even though Dr Gordon kept the petitioner at full duty in March of 2014, it was Dr Gordon who ordered the MRI that was performed on March 18. And it was the very next day when the respondent told petitioner, You no longer have a job here. So even though Dr Gordon had him working full duty, Dr Gordon was still checking things out. Otherwise, he never would have ordered an MRI of the person's hand and wrist. And, of course, we all know he was ultimately operated on by Dr. Greeting for decor veins, tenosynovitis. So there was clearly something going on there. He was clearly in need of more treatment. And under these facts and circumstances to conclude, he had quit. It's simply wrong. Can I ask you a question? Holden testified that it was his understanding that the claimant had quit, and then it was brought out in further testimony. He didn't get that from the claimant. So it stands to reason, then, that his understanding was the product of hearsay. Did you make any objection and move to strike it? There was no objection made, Your Honor. There was no motion to strike that testimony. And unfortunately, I was not petitioner's trial counsel. I took over after the case went up on appeal. So if there's no objection to the hearsay, then the hearsay stays in. That is true. To be weighed with other evidence. That's true. Okay. Your time is up, counsel. Thank you both for your arguments in this matter. It will be taken under advisement. A written disposition shall issue, and the court will stand in recess, subject to call. And thank you, counsel, both for participating in this Zoom hearing.